**J. T. CLARK and Wife, Janice Clark, Appellants,**

v.

**TEXACO, INC., Appellee.**

No. 16404.

Court of Civil Appeals of Texas.

Dallas.

Sept. 25, 1964.

Rehearing Denied Oct. 23, 1964.

**954**

Carter, Gallagher, Jones & Magee and Ben Warder, Jr., Dallas, for appellants.

Thompson, Knight, Wright & Simmons; Frank Finn, Jr., Pinkney Grissom, George C. Chapman, Dallas, for appellee.

DIXON, Chief Justice.

J. T. Clark and wife, Janice Clark, appellants, brought suit against Texaco, Inc. and Thomas A. Beckett, operator of a service station, for damages for personal injuries sustained by Mrs. Clark when her car, driven at the time by Beckett, collided with a culvert.

Texaco, Inc., moved for summary judgment. The trial court severed the causes of action against Texaco, Inc. and Beckett, then sustained the motion for summary judgment. Accordingly, judgment was rendered that appellants take nothing against Texaco, Inc.

To determine whether appellants have raised a fact issue or issues we must carefully analyze the evidence as developed by several affidavits and exhibits and the depositions of seven witnesses.

## FACTS

Mrs. Janice Clark, while visiting in Austin, Texas, on March 8, 1963, accompanied by her 15-year old son and another boy, Ward Hunt, drove her car, a new Chevrolet Impala, to a Texaco service station operated by Victor Batla in order to purchase gasoline. She asked for "Sky Chief" gasoline because her car motor required high octane gasoline. Soon thereafter the motor began to make a pinging noise which grew worse until Mrs. Clark was afraid to drive the car.

Next day her husband arrived from Dallas. Mrs. Clark and her husband were of the opinion that they had received "Fire Chief", a low octane gasoline, rather than "Sky Chief", a high octane gasoline. Batla declined to do anything about the complaint and informed Clark that he should take the matter up with Harold E. Ruhlman, a merchandising salesman employed by Texaco, Inc. Ruhlman's duties include the arranging for the leasing of nineteen Texaco serv-

ice stations in Austin and helping the operators, independent business men, to promote their business in various ways and keeping them advised as to Texaco's national advertising program. One of his duties is to take complaints of customers of dealers.

Ruhlman was not in his office when Clark called, but the complaint was relayed to him. He contacted Batla and confirmed the fact that the complaint had been made. Ruhlman then communicated with Mrs. Clark by telephone and told her to take the car to Beckett's service station and he would meet her there. Mr. Clark had been unable to remain in Austin.

This was not the station where Mrs. Clark had bought the gasoline. However, Ruhlman had already talked to Beckett and had told him about Clark's complaint. He had told Beckett to check the timing of the motor, and if the timing was all right to drain the gasoline from the tank and replace it with "Sky Chief" gasoline. He further told Beckett not to bill the customer for the gasoline—that Texaco, Inc., would pay for it and would pay Beckett for his services.

Beckett did not readily agree to comply with Ruhlman's request. It was about 6:30 or 7:00 o'clock in the evening and Beckett was ready to go home. However, he finally agreed to remain at the station and to take care of the Clarks' automobile as Ruhlman desired him to do. Ruhlman told Beckett that he, Ruhlman, would meet Mrs. Clark at Beckett's station as soon as possible.

Mrs. Clark arrived at Beckett's station before Ruhlman did. Her arrival was expected. She did not tell Beckett what to do. He already knew, having talked to Ruhlman.

When Ruhlman arrived a short time later, Beckett had placed the car on a rack and was siphoning the gasoline from the tank. He told Ruhlman he had tested the timing and it was all right. There is testimony that Ruhlman thereupon told Beckett to fill the tank with "Sky Chief" gasoline. This was done. Beckett then stated that the car should be driven some distance in order to road test the car and burn out the old gasoline which might still be in the fuel lines. For that purpose Beckett drove the car. Mrs. Clark was sitting on the back seat and Ward Hunt on the front seat beside Beckett. Mrs. Clark's son remained at the service station. Several miles from the service station the collision occurred in which Mrs. Clark, Beckett and Hunt were injured.

Since appellant contends that there is a fact issue raised by the evidence as to whether Beckett was an independent contractor or a servant, agent and employee of Texaco, Inc. at the time Mrs. Clark sustained her injuries, we deem it appropriate to reproduce parts of the testimony.

*Beckett's testimony:*

"Question: What else did he [Ruhlman] tell you?

"Answer: He told me that he wanted me to check the timing on the car, to see if the timing was as it should be, and if the timing was all right, then he wanted me to turn the gas out and fill the car with Sky Chief Gasoline.

"Question: Did he tell you the name of the people?

"Answer: He told me a Mrs. Clark."

\* \* \* \* \* \*

"Question: Then when you told Mr. Ruhlman that, what did he tell you?

"Answer: He told me that he would appreciate it if I would do it, and insisted that I do it for him, so I finally agreed to.

"Question: You agreed to stay and do this service for him?

"Answer: Yes, sir.

"Question: Did he tell you that he would come to the station also?

"Answer: He said he would."

\* \* \* \* \* \*

"Question: Was Mr. Ruhlman there at the time the timing was checked?

"Answer: I think he arrived there just about at that time.

"Question: Up to then, had Mrs. Clark made any complaint except about this pinging in her conversation with you?

"Answer: Actually, Mrs. Clark came in—I mean she just told me that this was the car, Mr. Ruhlman had instructed me as to what he wanted done, and I was following Mr. Ruhlman's instructions.

"Question: And you really had no conversation with either Mrs. Clark or either of the boys?

"Answer: Other than to identify the fact that she was the one that had the car with the gasoline problem."

* * * * * *

"Question: Was it your understanding from Mr. Ruhlman before that that the customer was to pay for the gasoline, or Texaco was, or that you were?

"Answer: He told me to make no charge to the customer—that he would reimburse me for the gasoline and the service.

"Question: And had he told you that before the customer came?

"Answer: Yes, sir. He told me to make no charge—to check the timing, and if the timing was proper, then to drain the car and fill the car."

* * * * * *

"Question: And then what were you to do with the gasoline that you had siphoned out of the car?

"Answer: He said that he wanted to check it to see if there was something wrong with the gasoline.

"Question: That was just something that you were going to turn over to him, I assume.

"Answer: Yes, sir."

* * * * * *

"Answer: * * * I turned to Mr. Ruhlman and told him that the only thing that would completely eliminate the pinging was to drive the car and burn the rest of the gasoline out of the car.

"Question: And Mr. Ruhlman told you to do that?

"Answer: And he said, 'Yes.' "

* * * * * *

"Question: And he told you that he wanted the timing checked and if it was all right, he wanted you to take the gas out and put in the best that you had?

"Answer: Yes, sir.

"Question: And that he would pay you for the service and for the gasoline?

"Answer: Yes, sir.

"Question: And that was your arrangement with Mr. Ruhlman?

"Answer: Yes, sir."

* * * * * *

"Question: The Clarks had no arrangement with you?

"Answer: No, sir.

"Question: Their arrangements were all with Mr. Ruhlman, according to your understanding of things?

"Answer: Yes, sir."

*Ruhlman's testimony:*

"Answer: * * * I asked Tom what he had done, and he said that he had taken the timing on it, and that it was perfect, and he said, 'All I can do is to drain it out.' And I said, 'Well, that will be fine.' And he proceeded to drain the gasoline out."

* * * * * *

"Question: Did you also agree to pay Tom Beckett for checking the timing on the car?

"Answer: If there was any charge, I would have paid it; but generally—

"Question: That is something that you didn't expect Mrs. Clark to pay?

"Answer: No.

"Question: And to your knowledge, she had no arrangements of her own with Tom Beckett?

"Answer: On what?

"Question: About refilling this gas and all that. I mean you had made the arrangements with Tom, and you made the arrangements with her, but as between Mrs. Clark and Mr. Beckett, no arrangements were made that you know of?

"Answer: Not that I know of."

*　*　*　*　*　*

"Question: But it is a continual problem to see to it that your customer gets your product as advertised?

"Answer: Yes, sir.

"Question: And that is a concern of yours as a merchandising salesman?

"Answer: Yes, sir.

*Mrs. Clark's testimony:*

"Question: All right. And then, what happened after that?

"Answer: Well, Mr. Ruhlman says to Mr. Beckett, 'If you are sure the timing is perfect, drain the gas, and we'll fill it with Sky Chief gas'."

*Ward Hunt's testimony:*

"Question: Now, were you present, and did you hear Mr. Ruhlman tell Mr. Beckett to drain the tank?

"Answer: Yes, sir.

"Question: Did Mrs. Clark make any of these arrangements directly with Mr. Beckett?

"Answer: No sir, Mr. Ruhlman primarily told him."

*　*　*　*　*　*

"Question: All right. And then what happened?

"Answer: Mrs. Clark and I were in the car and Mr. Beckett walked around and got in and said, 'I am going to drive it around the block'. And drove out of the station."

*　*　*　*　*　*

"Question: Did you agree that he could drive the car, or did Mrs. Clark agree that he could drive the car, or did she say that he should or should not?

"Answer: Well, we didn't even know that he was in there. We didn't tell him to.

"Question: Well, you saw him get in the car.

"Answer: Yes sir.

"Question: And then I assume he announced he was going to drive it around the block?

"Answer: Yes, sir."

*　*　*　*　*　*

"Question: All right, Was anything further said about him driving it or not driving it? At that point.

"Answer: No sir. Mrs. Clark asked him where we were going, though.

"Question: That is all that was said as far as you remember there in the driveway?

"Answer: Yes sir."

Attached to an affidavit by Ruhlman are three written contracts between Texaco, Inc. and Beckett: (1) a lease agreement covering the premises on which Beckett's

service station is located; (2) a sales agreement whereby Beckett agrees to purchase and Texaco, Inc., agrees to sell certain named products; and (3) a gasoline consignment contract.

## Opinion

Appellants base their appeal on eight points of error, all of which are vigorously disputed by appellee in fourteen counterpoints.

In their first three points on appeal appellants say that (1) the record does not establish as a matter of law that Beckett was acting as an independent contractor in handling appellants' complaint against Texaco, Inc.; (2) a genuine issue of fact exists as to whether Beckett at the time was acting as the agent; or (3) as the servant of Texaco, Inc. We agree with appellant in regard to these points.

It is undoubtedly true, as appellee contends, that as long as Beckett operates under the terms of his three contracts with Texaco, Inc. his status is that of an independent contractor. It has been so held in several cases in which similar agreements have been considered. Texas Co. v. Wheat, 140 Tex. 468, 168 S.W.2d 632; Frye v. Sinclair Oil & Gas Co., Tex.Civ.App., 249 S.W.2d 102; Hayes v. Travelers Ins. Co., Tex.Civ.App., 358 S.W.2d 254; McGee v. Phillips Petroleum Co., Tex.Civ.App., 373 S.W.2d 773.

But an entirely different situation is presented when we consider Beckett's status while he was handling the Clark complaint for Texaco, Inc. The contracts under which Beckett operated his station make no mention of the handling by Beckett for Texaco, Inc. of complaints originating in other service stations. There is evidence that there was a separate oral agreement under which Beckett handled the Clark complaint at the direction of Ruhlman, the representative of Texaco, Inc., who was in charge of complaints for Texaco, Inc. There is evidence that Texaco, Inc. acting

through Ruhlman, made all the arrangements with Beckett, including payment to Beckett for his gasoline and services. There is no evidence in the record before us that the Clarks made the arrangements for Beckett to handle the complaint or remedy the defect in gasoline, if there was one. The testimony is such that it could support an inference that Texaco, Inc. through Ruhlman had a right to control Beckett's activities in the course of handling the Clark complaint. Southern Underwriters v. Samanie, 137 Tex. 531, 155 S.W.2d 359, 362. And right to control is the test. Halliburton v. Texas Indemnity Ins. Co., 147 Tex. 133, 213 S.W.2d 677. It is recognized that one may be an independent contractor under some circumstances yet may be a servant, agent and employee in connection with other work or activities. Standard Ins. Co. v. McKee, 146 Tex. 183, 205 S.W.2d 362, 365; Helms v. Sinclair Refining Co., 5 Cir., 170 F.2d 289; Mills v. Jones' Estate, 213 Miss. 680, 56 So.2d 488, 57 So.2d 496; 27 Am.Jur. 500. Appellants' first three points are sustained.

In their fourth, fifth, sixth and seventh points appellants assert that there are fact issues as to (4) apparent agency, (5) implied agency, (6) estoppel and (7) reasonable belief that the services were being rendered by Texaco, Inc., or its servant Beckett.

An apparent or ostensible agent is one "whom the principal either intentionally or by want of ordinary care induces third persons to believe to be his agent although he has not either expressly or by implication conferred authority on him." Roberts v. Capitol City Steel Co., Tex.Civ.App., 376 S.W.2d 771, 775; Collins v. San Antonio Food Products and Produce Co., Tex.Civ.App., 188 S.W.2d 888, 890. We are of the opinion that the record before us raises a fact issue as to apparent or ostensible authority. Appellants' fourth point is sustained.

We find no pleadings alleging issues of implied agency or reasonable belief. So

far as the record shows these issues were not presented to the trial court at the hearing on appellees' motion for summary judgment. They cannot be raised on appeal for the first time. State of California Dept. of Mental Hygiene v. Bank of Southwest Nat'l Ass'n et al., Tex.Civ.App., 348 S.W.2d 731 (aff. 163 Tex. 314, 354 S.W.2d 576); Moseley v. T. & N. O. R. Co. et al., Tex.Civ.App., 346 S.W.2d 636. Appellants' fifth and seventh points are overruled.

 To support equitable estoppel or estoppel *in pais* there must be some evidence of false representation or concealment of material facts. Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929, 932; Marek v. Goyen, Tex.Civ.App., 346 S.W.2d 926; Red Jacket Mfg. Co. v. Adams, Tex.Civ.App., 346 S.W.2d 897; 22 Tex.Jur.2d, Estoppel, Sec. 8. We agree with appellees that the record contains no evidence of false representations, concealment of material facts, or deception on the part of Texaco, Inc., or its representative Ruhlman. Appellants' sixth point is overruled.

 In their eighth point appellants contend that the evidence raises a fact question as to whether Beckett was in the course of his employment for Texaco, Inc., at the time Mrs. Clark sustained her injuries. We agree with appellants. We have concluded in sustaining appellants' first three points that the evidence raises a fact issue as to whether Beckett at the time in question was the servant, agent and employee of Texaco, Inc. Having so held we now hold that the evidence raises the additional fact issue as to whether Beckett was engaged in the course of his employment.

There is testimony that after testing the timing of the motor, siphoning the gasoline out of the tank and replacing it with "Sky Chief" gasoline, Beckett told Ruhlman the car should be road tested or driven for a while in order to use up all the old gasoline still in the fuel lines. There is evidence in the record that Ruhlman gave his consent. It was while Beckett was driving the car for that purpose that the collision occurred. Appellants' eighth point is sustained.

Because we believe the record discloses undetermined fact issues, the summary judgment is reversed and the cause is remanded for trial on the merits.

Reversed and remanded.