**HALL DADELAND TOWERS ASSOCIATES**

v.

**Donald W. HARDEMAN, Jr. and Donna M. Hardeman**

v.

**HALL SECURITIES CORPORATION, Hall 85 Associates, and Craig Hall.**

No. CA3–87–2433–F.

United States District Court, N.D. Texas, Dallas Division.

May 8, 1990.

Brian Hurst of Jenkens & Gilchrist, Dallas, Tex., for the Hardemans.

Michael Logan of Baker, Mills & Glast, Dallas, Tex., for the Hall parties.

## AMENDED MEMORANDUM OPINION AND ORDER

ROBERT W. PORTER, District Judge.

On September 5 and 6, 1989, this cause came on to be heard by the Court. After hearing the testimony and after reviewing the parties' briefs, the applicable law, and all the relevant facts, exhibits, and depositions, the Court is of the opinion that Defendants/Third–Party Plaintiffs Donald W. and Donna M. Hardeman (hereinafter "the Defendants" or "the Hardemans") should recover from the Plaintiff, Hall Dadeland Towers Associates, and Third–Party Defendants Craig Hall and Hall 85 Associates, as set forth below.[1]

**I. Factual Background**

A. Stipulated Facts

(1) Hall Dadeland Towers Associates (hereinafter "Hall Dadeland Partnership") is a Texas limited partnership with its principal place of business in Dallas County, Texas, and was formed to acquire and operate an office building and garage in Dade County, Florida.

(2) Hall Securities Corporation (hereinafter "HSC") is a Michigan corporation with its principal place of business in the State of Texas.

(3) Defendants, Donald W. Hardeman and Donna M. Hardeman (the "Hardemans") are residents of Florida and are *sui juris.*

(4) At all times material hereto, William H. Mikulin ("Mikulin") was a resident of the State of Texas, but was engaged in the sale of securities in the State of Florida.

(5) Hall 85 Associates is a Texas general partnership with its principal place of business in the State of Texas, and is the general partner of the Hall Dadeland Partnership.

(6) Craig Hall is an individual resident and citizen of the State of Texas and is the managing general partner of Hall 85 Associates.

(7) In September 1985, Mikulin offered to sell to the Hardemans a limited partnership interest in the Hall Dadeland Partnership.

(8) On 9/30/85 the Hardemans signed a Subscription Agreement (see Plaintiff's Ex. 1) for the purchase of one unit in the Hall Dadeland Partnership for a total purchase price of $108,000.

(9) On 9/30/85 the Hardemans executed a Promissory Note (see Plaintiff's Ex. 2) in favor of the Hall Dadeland Partnership in the amount of $103,000.

---

**1.** At the beginning of the trial the parties, with the Court's permission, agreed to realign themselves for procedural simplicity, with the express understanding that there was to be no change in any party's burden of proof. Thus, Plaintiff Hall Dadeland Towers and the Hall third-party defendants were designated as defendants, and Defendants Hardeman were designated as plaintiffs and therefore presented their evidence first. However, during the course of this memorandum, all references to the parties are referenced as they were originally aligned. Similarly, with regard to references to exhibits, such references are made as originally marked and submitted to the Court prior to trial, *i.e.,* the Hardemans' exhibits are cited as "Defendants' Exhibits", and the various Hall entities' exhibits are cited as "Plaintiffs' Exhibits".

(10) On 9/30/85 the Hardemans executed an Investment and Estoppel Letter (see Plaintiff's Ex. 3) in favor of the Hall Dadeland Partnership.

(11) On or about 9/30/85 the Hardemans delivered to Mikulin a $5,000 check payable to the Hall Dadeland Partnership.

(12) The Hardemans paid a total of $15,000 due under the Note, for total payments toward the Partnership of $20,000; the balance due under the Note is $88,000 plus accrued interest.

(13) Mikulin was a registered representative for Pilot Financial Services, Inc. and acted as broker for the sale of the limited partnership interest.

(14) The limited partnership interests sold by the Hall Dadeland Partnership are "securities" within the meaning of the Florida blue sky laws.

(15) The Hardemans' partnership interest has not been reassigned, sold or transferred to any other person, group or entity.

### B. Additional Facts [2]

"Hall Real Estate Group is a coordinated group of affiliated companies that manages, markets and syndicates real estate and real estate related businesses." (Plaintiffs' Ex. 11 at 34). The following corporations are considered part of the Hall Real Estate Group: (1) Hall Real Estate Corporation; (2) Hall Management Corporation; and (3) Hall Securities Corporation. (*Id.*) Each of these entities is headed by Craig Hall as the Chairman of the Board; William E. Cox was Vice President of HSC. (*Id.* at 34–35). Craig Hall is the Chairman and sole shareholder of the Hall Real Estate Group. (*Id.* at 37). HSC was the underwriter of the Partnership. (*Id.* at 2).

William E. Cox was employed by HSC as a vice-president and wholesaler of securities from about January, 1984 through August 31, 1985. (Cox Dep. at 13, 26). As wholesaler and vice-president, his duties were to assist HSC's sales efforts by encouraging broker/dealers to represent HSC's products, namely, the various Hall limited partnerships, such as the Hall Dadeland Partnership. (*Id.* at 15). While in this capacity with HSC, Cox was compensated on a salary basis plus bonus dependent upon HSC's profitability. (*Id.* at 16). Effective 9/1/85, Cox's employment relationship with HSC changed. Cox was no longer an employee and wholesaler for HSC; rather, he became an independent contractor and a direct sales representative of Hall products.[3] Cox no longer drew a salary from HSC and instead had a contract with HSC that provided for a schedule of commissions.[4] (See Plaintiffs' Ex. 27).

Planning ahead and with Cox's forthcoming change in employment in mind, Cox and Mikulin decided to go into business together. To that end, Cox and Mikulin filed in Harris County, Texas, on 8/28/85, an "assumed name" certificate to do business as "Hall Financial". (See Defendants' Ex. 1). Cox and Mikulin chose this assumed name because they reasoned that: (1) they would be selling primarily Hall products; (2) theirs was to be a financial services business; (3) they wanted prospective buyers to believe that Cox and Mikulin were associated with the various Hall entities; and (4) they believed that the name "Hall Financial" would serve to add to their credibility in their sales efforts. (See Cox Dep. at 28–29, 43; Mikulin Dep. at 32, 68). Consistent with their assumed name, Cox and Mikulin had "Hall Financial" business

---

**2.** To the extent that there is any conflicting testimony or exhibit regarding the facts as set forth by the Court in this memorandum opinion, the facts as set forth herein are to be construed as the Court's findings of fact in its capacity of fact-finder in this trial without a jury.

**3.** As a direct sales representative, Cox was able to sell directly to consumers rather than restricting his activity to soliciting broker/dealers to represent the programs as he had done in his capacity as wholesaler and vice-president of HSC.

**4.** The Court further notes that after 8/31/85, Hall no longer deducted FICA or other withholding taxes from Cox's commissions, and that Cox received a "1099 form" for income tax reporting purposes rather than a W–2 form for post–8/31/85 commissions. (See Cox Dep. at 100).

cards and stationery drawn up with their address, names and phone number on them. Because their office was located in the same building, on the same floor, and just next door to HSC's Houston office, the address was virtually identical to that of HSC's. (Compare Defendants' Ex. 24 with Defendants' Ex. 25). In addition, Cox and Mikulin designed the format of their stationery to look the same as the stationery of HSC and the Hall Financial Group entities, *i.e.*, gray paper with the company name in blue printing. (Mikulin Dep. at 26–28, 31–32).[5]

Shortly after Cox and Mikulin filed their assumed name certificate for "Hall Financial" in Harris County, an assumed name certificate was filed by the Hall entities on 9/5/85, also in the records of Harris County, for the name "Hall Financial Group". In addition to the constructive notice to the Hall companies that Cox and Mikulin were using the name "Hall Financial"—by way of the filing of the assumed name certificate in Harris County prior to the date that Hall filed its assumed name—the Court finds that it is more likely than not that Hall also received actual notice of the use of the name "Hall Financial". Such actual notice occurred: (1) at the time the assumed name "Hall Financial Group" was filed on 9/5/85; (2) through HSC's agent and Vice President, William E. Cox, who was employed by HSC through 8/31/85 and who was employed in that capacity on 8/28/85, the date the assumed name of "Hall Financial" was filed; and (3) through Jack Brubaker, who succeeded Cox as Vice President for HSC's Houston office, and

who officed next door to the "Hall Financial" office.[6]

In September 1985, when Cox was no longer an employee of HSC, but while still a registered agent for HSC,[7] Cox and Mikulin traveled to Miami to attend a sales meeting sponsored by the Hall Group for the purpose of informing broker/dealers of the investment opportunity in the Hall Dadeland Partnership. After the sales meeting, Cox and Mikulin called on various investment advisors, CPAs, attorneys and tenants in the Hall Dadeland Towers building in a generalized sales effort. (Cox Dep. at 50–51, Mikulin Dep. at 21–22). It was during this general effort that Messrs. Cox and Mikulin first met McHenry Hamilton, a Miami CPA, and introduced Hamilton to the investment opportunity in the Hall Dadeland Partnership. During that visit, Cox and Mikulin told Hamilton that they represented Craig Hall, the managing general partner [of Hall 85 Associates which in turn was the only general partner of the Hall Dadeland Partnership, see Plaintiffs' Ex. 11 at D–1 and 36] and presented Hamilton with a memorandum (Cox Dep. at 50–51, 57–59; Mikulin Dep. at 38–39) on Hall Securities Corporation letterhead, dated 9/6/85 and without a specific addressee thereon, which briefly summarized the financial attributes and projected performance of an investment in the Hall Dadeland Partnership. The memorandum bore a closing caption of "Very truly yours, William E. Cox and William H. Mikulin." (Defendants' Ex. 24). Cox still had HSC business cards with him at this time, and "very likely" used them on his Miami calls (Cox Dep. at 53), while Mikulin gave Hamilton a

---

5. After review of conflicting evidence, it is the Court's finding of fact that the name "Hall Financial" was not put on the office door.

6. Additional evidence of HSC's and the Hall companies actual notice of the use by Cox and Mikulin of the name "Hall Financial" is as follows:

(1) Cox's testimony that a vice-president from HSC's Dallas office came down for a visit and was "definitely" aware that they were doing business as "Hall Financial" (Cox Dep. at 43–44);

(2) Cox's testimony that Jack Brubaker, whose office was next door, "could have" been aware of their doing business as "Hall Financial" in September 1985 since Brubaker was "Hall Financial"'s wholesaler and presented products to their partnership (Cox. Dep. at 44–45);

(3) Mikulin's testimony that he saw Brubaker sometimes 2 to 3 times per day, that they answered their telephone "Hall Financial", that Brubaker frequently visited their office, and finally that Brubaker *was* in fact aware that they were doing business as "Hall Financial" (Mikulin Dep. at 33–34, 102).

7. Cox was registered with the Texas State Securities Board as an agent for HSC from 4/10/84 through 4/25/86. *See* Defendants' Ex. 30.

"Hall Financial" business card (Mikulin Dep. at 35–37). Understandably, the visit left Hamilton with the impression that Cox and Mikulin worked for Craig Hall. Soon after, Donna Hardeman visited Hamilton's office and Hamilton passed the HSC letter (Defendants' Ex. 24) on to her for her information and review. Thereafter there was direct communication only between the Hardemans and Mikulin of "Hall Financial" regarding the investment in the Hall Dadeland Partnership.[8] The Hardemans were interested in the investment, but were concerned that adverse changes in the tax laws and other possible future economic developments could limit their ability to continue in the Partnership should they elect to invest.

The disclosure of offering-related information, as well as information on the transferability of partnership units, is found in Plaintiffs' Ex. 11, entitled "Confidential (Private Placement) Memorandum—Hall Dadeland Towers Associates Limited Partnership" (hereinafter "the Confidential Memorandum"), which bears a date of 7/18/85. Certain relevant provisions contained in the Confidential Memorandum are as follows:

- "STATEMENTS CONTAINED IN THIS CONFIDENTIAL MEMORANDUM AS TO THE CONTENTS OF THE PARTNERSHIP AGREEMENT OR ANY OTHER AGREEMENT OR DOCUMENT REFERRED TO HEREIN ARE NOT NECESSARILY COMPLETE."

–Plaintiffs' Ex. 11, Cover Page at 2.

- "NO PERSON (OTHER THAN THE GENERAL PARTNER AND PERSONS AUTHORIZED TO ACT ON ITS BEHALF) IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM AND ANY SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON. NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALES MADE HEREUNDER SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE MATTERS DISCUSSED HEREIN SINCE THE DATE HEREOF."

–Plaintiffs' Ex. 11, Cover Page at 3.

- "7. *Limited Transferability of Units.* Units may be transferred only under certain conditions which are set forth in the Agreement."

–Plaintiffs' Exhibit 11 at 13.

- "Section 9.03. *Transfer.*

    . . . .

    (b) [N]o Limited Partner may transfer his interest as a Limited Partner in the Partnership except as provided in this Partnership Agreement.

    (c) Subject to obtaining the consent of the General Partner:

    (i) A Limited Partner shall, after receipt of a *bona fide* offer to purchase, have the right to transfer his interest as a Limited Partner in the Partnership, but only after he has first offered

---

**8.** At trial various objections to the admission of exhibits and testimony were made and carried along pending the Court's review. The following are the Court's rulings on these objections:

(a) With regard to Defendants' Exhibits 4(a), (b), (c), (j), (m), (q), (r), and (s), Plaintiffs' objections to admitting into evidence said exhibits are all *sustained* pursuant to Fed.R.Ev. 803(5) inasmuch as said exhibits were never offered by Plaintiffs. Of course, the witness's direct testimony, based upon her refreshed memory and first hand knowledge, remains admissible to the extent it is not hearsay within hearsay.

With regard to those statements made by people other than the writer of the notes and re-

corded by the writer/witness within the aforementioned exhibits (hearsay within hearsay), which statements were read into the record by the witness, Plaintiffs' hearsay objections are also *sustained,* and the record shall be construed to be revised so as to delete all such statements.

(b) With regard to Plaintiffs' Ex. 31, the Defendants' timely hearsay objection is hereby *sustained,* and said exhibit is not admitted into the record.

(c) With regard to Plaintiffs' Ex. 37, Defendants' relevance objection is *overruled,* and said exhibit is deemed admitted.

in writing to sell such interest to the General Partner....

. . . .

(iii) The General Partner shall not consent to the assignment of a Limited Partner's interest unless, in the discretion of the General Partner, the assignee has:

(A) Provided an opinion of counsel ... that neither the offering nor the assignment of the Partnership interest violates any provisions of federal or state securities or comparable law, nor causes the loss of any exemption from federal or state securities or comparable law, ... nor causes the Partnership to be taxed as a corporation rather than a partnership under the Internal Revenue Code of 1954, as amended;

. . . .

. . . .

. . . .

. . . .

(iv) The provisions of Section 9.03(c) hereof shall not apply to a transfer of a limited partnership interest to another member of the Partnership.... *The General Partner, in its sole discretion, may waive any condition of transfer set forth in this Article IX.*

–Plaintiffs' Ex. 11, Exhibit D ("Hall Dadeland Towers Associates Limited Partnership Amended and Restated Agreement and Amended and Restated Certificate of Limited Partnership") ("the Agreement") at D–22–23 (emphasis added).

Donna Hardeman was verbally reassured by Mikulin, Hall's broker, that Hall's policy had been that if the Hardemans' situation was economically changed in the future, that the Defendants could write a letter, together with a letter from their CPA to the same effect, stating that the Defendants' financial situation had changed for the worse and that then "we would get to work on reassigning the balance of the unit." (Mikulin Dep. at 50–51). Mikulin also assured the Defendants that approxi-

mately 175 limited partnership units had been reassigned in that year, and that there were none that had not been reassigned at that point in time. (*Id.* at 51). Thereafter, the Defendants sent to Mikulin, on or about 9/30/85, a check in the amount of $5,000, bearing the following restrictive legend:

This check is tendered with the expressed understanding that HALL will repurchase our unit at any time with no penalty if financial reasons cause us to request such action.

–Defendants' Exhibit 5.

After receiving this check, Mikulin called Hall Securities to inquire whether such a check was acceptable. HSC advised Mikulin that it could not. Mikulin then returned that check to the Defendants and wrote them a letter purporting to summarize HSC's policy with respect to the reassignability of partnership units. That letter, dated 10/8/85 and on "Hall Financial" letterhead, represented that the Hall Group's policy and position on reassignment was as follows:

If an investor can not economically afford to stay in a program, the investor needs to write a letter to the general partner stating that condition. Additionally, the investor should have his accountant or tax attorney write a similar letter confirming the investor's position. At that point, *Hall will reassign the balance of the original investor's unit* to another investor. There is no sale, no exchange of cash, no forfeiture from the program and no taxable event; there is simply a reassignment of the balance of the unit to a new investor. As a result, the original investor maintains his pro rata equity in the investment for which he purchased.... [T]hroughout the company's 17 year history, Hall has never lost a dime of the investors' money and has always been able to reassign any and all units that have come available. For the current year of 1985, there have been 173 units put up for reassignment through September 15 and all of these units have been reassigned. I hope this letter answers your questions regarding

reassignments and the non-existence of a secondary market.

–Defendants' Ex. 6 (emphasis added).

Following the receipt of this letter and another letter (Defendants' Ex. 7) requesting another check dated 9/30/85, the Hardemans sent Mikulin a check without restrictive endorsement and became limited partners.

By July 1986, it became necessary for the Hardemans to care for and support Mr. Hardeman's incapacitated mother and they had vacant rental properties. It became necessary, in the Hardemans' opinion, to withdraw from the Partnership due to their perceived financial hardship. Accordingly, they and their CPA sent letters stating as much to the Hall Dadeland Partnership and formally requested a reassignment of their partnership interest (Defendants' Ex. 8 and 10). HSC responded that it only offers its "best efforts" at reassignment and that "[t]here are no guarantees that a new investor will be found." (Defendants' Ex. 9 and 12). Due to new legislation, however, there was "little interest in the purchase of this type of investment due to uncertainty about the new tax law, and ... the total elimination of benefits for a substitute investor would make a future transfer impractical." (Defendants' Ex. 9 at 2).

After Plaintiffs' failure to reassign the Hardemans' Partnership interest as requested, the Hardemans discontinued payments on their Note. The Note was accelerated, formal demand was made upon the Hardemans (Defendants' Ex. 21), and this lawsuit and controversy began.

## II. *Analysis*

### A. Agency

The Hall Plaintiffs' position on their obligation to reassign Partnership interests is clearly at odds with Mikulin's representation of HSC's reassignment obligations. Thus the Court looks to determine whether or not the Plaintiffs are to be held legally obligated by Mikulin's representations.

#### (1) *Actual Authority: Express and Implied*

■ An agency relationship denotes a consensual relationship between two persons in which the agent is to act for and on behalf of the principal and is subject to the principal's control. *Carr v. Hunt*, 651 S.W.2d 875 (Tex.App.–Dallas 1983, writ ref'd n.r.e.). If a principal has expressly conferred upon another, or delegated or granted authority to another to do a certain act or series of acts—either orally or in writing—then the authority of the agent in that respect is "express actual authority". 3 *Tex.Jur.3d*, Agency § 40. The term "implied actual authority" encompasses that which is reasonably necessary and proper to perform the principal act or transaction, the performance of which has either been expressly delegated to the agent, *Houston Packing Co. v. Spivey*, 333 S.W.2d 423, 426–27 (Tex.Civ.App.1960), or otherwise manifested by the principal that the particular authority in question shall exist in the agent. *Saunders v. Commercial Industries Service Co.*, 541 S.W.2d 658, 660 (Tex. Civ.App.–Eastland 1976).

An independent contractor is unlike an agent in that he is responsible to his employer only for the result of the work contracted to be performed and is not under the immediate direction of the employer, whereas the agency relationship presupposes some degree of control by the principal over the agent. *Id.; Olson v. B.W. Merchandise, Inc.*, 388 S.W.2d 737 (Tex.Civ.App.–Austin 1965). A contract that expressly provides for an independent contractor relationship will not govern the relationship if evidence shows that the contract was a sham or subterfuge designed to conceal the true relationship. *Humphreys v. Texas Power & Light Co.*, 427 S.W.2d 324 (Tex.Civ.App.–Dallas 1968, writ ref'd n.r.e.).

In the instant case, there was a contract between HSC as underwriter and Pilot Financial Services, Inc. as broker/dealer (the firm for which Mikulin worked) that expressly provided as follows:

> You [Pilot] understand that you are not authorized to act as agent for us [HSC] or the Partnership in any connection or transaction, and you agree that you will not act as agent or purport to do so.

Any act to be performed by you with respect to the offering of Units pursuant hereto shall be as an independent contractor.

–Defendants' Exhibit 29 at 2.

Defendants Hardeman argue that because Robert Cohen's testimony indicated that HSC's independent broker/dealers were permitted to describe the various Hall products to customers, that a legal finding of implied actual authority of Mikulin is the result. The Court disagrees, and is of the opinion that there was neither express actual authority nor implied actual authority vested in Pilot Financial or Pilot's agent or servant, Mikulin, with respect to any of the putative principals (the Plaintiffs).

### (2) *Apparent Authority*

■ An apparent agent is one " 'whom the principal either intentionally or by want of ordinary care induces third persons to believe to be his agent although he has neither expressly or by implication conferred authority upon him.' " *Clark v. Texaco, Inc.*, 382 S.W.2d 953, 958 (Tex.Civ. App.–Dallas 1964, writ ref'd n.r.e.) (quoting *Roberts v. Capital City Steel Co.*, 376 S.W.2d 771, 775 (Tex.Civ.App.–Austin 1964)). Apparent authority is based on estoppel and may arise from two sources:

> [F]irst, the principal may knowingly permit an agent to hold himself out as having authority, and in this way the principal becomes estopped to claim that his agent does not have authority; and second, the principal may knowingly or by want of care so clothe the agent with indicia of authority as to lead a reasonably prudent person to believe that he actually has such authority.

*Sorenson v. Shupe Bros. Co.*, 517 S.W.2d 861, 864 (Tex.Civ.App.–Amarillo 1974) (citations omitted). *Accord, Hale v. Cotton Petroleum Corp.*, 796 F.2d 74, 76 (5th Cir. 1986); *Cactus Pipe & Supply Co.*, 756 F.2d 1103, 1111 (5th Cir.1985).

(a) Knowingly permitting the agent to hold himself out as having authority

With regard to the first source described above, there is no evidence that the Hall Plaintiffs knowingly permitted Mikulin to hold himself out as the Plaintiffs' agent. Accordingly, apparent authority of Mikulin does not arise under this test.

(b) Knowingly or by want of care so clothe the agent with indicia of authority

With regard to whether the Plaintiffs "by want of care so clothe[d] the agent with indicia of authority as to lead a reasonably prudent person to believe that [Mikulin] actually ha[d] such authority", the Hardemans point to HSC's supplying Mikulin, its broker/dealer, with HSC's own sales literature, as well as to the fact that HSC knew that Cox and Mikulin were doing business as "Hall Financial".

Because the Court has found, *supra,* that Plaintiffs Hall knew that Mikulin was doing business as "Hall Financial", the Court also finds that the Plaintiffs "by want of care clothed the agent with indicia of authority". At issue, then, is whether the Hardemans conduct fell short of reasonable prudence, diligence and discretion under the circumstances.

As hereinbefore noted, the Partnership's Confidential Memorandum expressly stated that "NO PERSON (OTHER THAN THE GENERAL PARTNER AND PERSONS AUTHORIZED TO ACT ON ITS BEHALF) IS AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION NOT CONTAINED IN THIS MEMORANDUM AND ANY SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON." (See *supra* at 1428). There is no evidence that Mikulin ever asserted or warranted to the Hardemans sufficient authority in himself to issue the guaranty upon which the Hardemans relied. In addition, the transaction upon which the Hardemans base their claim occurred *after* the deal was to have closed originally, but the Defendants were informed by Mikulin that HSC found the Hardemans' proposed restrictive legend to be unacceptable. Importantly, the Court notes that the content of the restrictive legend [9] was not materially different from the essence of Mikulin's representation,

---

**9.** Set forth *supra.*

and yet the Hardemans relied upon it without verification from either the General Partner or Mikulin himself that Mikulin was authorized to act on the Partnership's behalf. One who deals with an agent bears the risk of lack of agency and is therefore obligated to ascertain not only the fact of agency, but also the extent of the agent's powers. *Boucher v. City Paint & Supply, Inc.*, 398 S.W.2d 352 (Tex.Civ.App.–Tyler 1966, no writ). It is the Court's opinion, therefore, that the Hardemans were not reasonably prudent and diligent in their reliance upon representations that were identical in content to that which HSC had earlier found unacceptable.

Accordingly, the Court is of the opinion that there was no apparent authority vested in Mikulin.

### (3) *Agency by Estoppel*

■ To the extent there is an agency by estoppel theory distinct from apparent authority under Texas law, then in order to create such an agency two elements must be established:

> First, the principal must have held the agent out in other instances or in the particular transaction as possessing authority sufficient to embrace the particular act in question, or must have knowingly acquiesced in the agent's assertion of the requisite authority; and, second, the person dealing with the agent must have relied upon the conduct of the principal to his prejudice.

*National Cash Register Co. v. Wichita Frozen Food Lockers, Inc.*, 172 S.W.2d 781, 789 (Tex.Civ.App.–Ft. Worth), *aff'd*, 142 Tex. 109, 176 S.W.2d 161 (1943).

There is no evidence to suggest that the Plaintiffs, in the transaction at issue or in any similar transaction, held Mikulin out to possess the authority sufficient to embrace Mikulin's act of issuing a "guarantee" to the Hardemans that "Hall will reassign the balance of the original investor's unit to another investor." (Defendants' Ex. 6).

With regard to whether the Plaintiffs "knowingly acquiesced" to Mikulin's assertion of authority requisite to embrace the transaction, it has been held that

The powers which the agent pretends to have, or assumes to exercise, are inoperative as a basis for ostensible authority when the principal is not affected by knowledge of them and does not validate them by acquiescence or consent, and no mere combination of circumstances which may, *without the principal's participation*, mislead third persons, however reasonably, into a false inference of authority affords a sufficient predicate for apparent authority.

*Roberts v. California–Western States Life Insurance Co.*, 470 S.W.2d 719, 724 (Tex. Civ.App.–Amarillo 1971) (emphasis in original) (citation omitted).

Although the Court has found that HSC had actual notice of the fact that Mikulin and Cox were doing business as "Hall Financial", that knowledge alone cannot be construed to be a knowing acquiescence to Mikulin's representations. Indeed, the evidence at trial demonstrated that the Hall Plaintiffs had no knowledge of Mikulin's unauthorized representations until 9/3/86, well after the events at issue herein. (See Defendants' Ex. 10). Accordingly, the Court finds that there is no agency by estoppel.

In summary, the Court is of the opinion that Mikulin was not an agent of the Plaintiffs, the Plaintiffs are not estopped to so claim, and accordingly none of Mikulin's representations are deemed to be imputed knowledge of any of the Hall Plaintiffs.

### (4) *Ratification*

Ratification is "the approval by act, word, or conduct, with full knowledge of the facts, of the prior act, with the intention of giving validity to such prior act." *Jamail v. Thomas*, 481 S.W.2d 485, 490 (Tex.Civ.App.–Houston [1st Dist.] 1972, writ ref'd n.r.e.). Where a purported agent's authority does not exist or does not encompass the misrepresentation sued upon, the principal may sue on the contract and will not, by so doing, be deemed to have ratified the unauthorized conduct of the agent. *Plains Cotton Cooperative Ass'n v. Wolf*, 553 S.W.2d 800 (Tex.Civ. App.–Amarillo 1977, writ ref'd n.r.e.).

It is the Court's opinion that there is no basis upon which Plaintiffs can be deemed to have ratified Mikulin's unauthorized representations.

### B. Defendants Hardemans' Claims

#### (1) *Breach of contract*

■ Because there was no agency relationship between Mikulin and the Hall Plaintiffs, Mikulin's representations were not part of the terms of the parties' contract, and Defendants had no absolute right to reassignment according to the Agreement of the parties (see Plaintiffs' Ex. 11, Ex. D thereof). There is no evidence to suggest that the Plaintiffs did not use their "best efforts" to reassign the Hardemans' Partnership interest, or that the Plaintiffs breached any term, material or otherwise, of the Agreement.

Accordingly, the Defendants' claim of breach of contract is DISMISSED with prejudice.

#### (2) *Negligent misrepresentation*

Because there was no agency relationship between Mikulin and the Hall Plaintiffs, and because there is no evidence of a misrepresentation by the Hall Plaintiffs, Defendants' claim for negligent misrepresentation is DISMISSED with prejudice.

#### (3) *Common law fraud*

■ The elements of common law fraud are: (1) a knowing misrepresentation or reckless representation of a material fact, or the failure to disclose material facts when under a duty to disclose, (2) with intent to induce action or inaction, (3) a reasonable reliance on the misrepresentation or omission, (4) and injury due to such reliance. *See, e.g., Dallas Joint Stock Land Bank v. Harrison,* 156 S.W.2d 963 (Tex.1941); *Candela v. Steidle,* 457 S.W.2d 461 (Tex.Civ.App.–Corpus Christi 1970, writ ref'd n.r.e.); *Connor v. Buckley,* 380 S.W.2d 722 (Tex.Civ.App.–Waco 1964); *Playland Park Stadium Corp. v. J.H. Spector & Sons,* 253 S.W.2d 466 (Tex.Civ. App.–Beaumont 1952); *Schonrock v. Taylor,* 212 S.W.2d 260 (Tex.Civ.App.–Austin 1948, writ ref'd).

Inasmuch as the Court has found that there was no misrepresentation or material omission by the Hall Plaintiffs, and *a fortiori* no intent to induce action or inaction, the above test has not been met. Accordingly, Defendants' claim of common law fraud is DISMISSED with prejudice.

#### (4) *Rule 10b–5*

■ The elements of a Rule 10b–5 claim are: (1) a material misrepresentation or omission by the defendant; (2) scienter on the part of the defendant; (3) justifiable reliance; and (4) due diligence by the investor in pursuing his own interest with care and good faith. *Stephenson v. Paine Webber Jackson & Curtis, Inc.,* 839 F.2d 1095, 1098 (5th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 310, 102 L.Ed.2d 328 (1988).

■ There is no evidence to support the finding of any misrepresentation or omission by the Hall Plaintiffs, nor any evidence which would support a finding of scienter. The Defendants' claim under Rule 10b–5 is therefore DISMISSED with prejudice.

#### (5) *Negligent supervision*

■ Defendants claim that Plaintiffs Hall "were grossly negligent in employing and supervising Mikulin to solicit investors" in the Partnership. Because Mikulin was an agent or employee for Pilot Financial, an independent broker/dealer, and was not an employee or agent subject to the direction or control of any of the Hall Plaintiffs, there was no corresponding duty to supervise on the part of the Hall Plaintiffs, and therefore no negligence attributable to the Hall Plaintiffs. Accordingly, the Defendants claim of negligent supervision is DISMISSED with prejudice.

#### (6) *Texas Securities Act*

■ Defendants seek relief under the Texas Blue Sky Law's anti-fraud provision.

The Court finds that there is no evidence that the Hall Plaintiffs: (1) employed any device, scheme, or artifice to defraud; (2) made representations of any untrue statements, or knowingly or recklessly omitted from disclosure any material facts; or (3)

engaged in any course of business which would serve to operate as a fraud or deceit. In addition, the Court finds that the Hall Plaintiffs did not know, and in the exercise of reasonable care, could not have known, of Mikulin's misrepresentation or omission. Accordingly, the Defendants' claim under *Tex.Rev.Civ.Stat.Ann.* art. 581–33 A is DISMISSED with prejudice.

### (7) *Florida Securities Act*

#### (a) Fraudulent transaction

■ Section 517.301(1)(a) prohibits the offer, sale or purchase of any security through the use of any device, scheme, or artifice to defraud; by means of any untrue statement or omission of material fact; or through the use of any practice or course of business which would operate as a fraud or deceit upon a person.

The Court finds that there is no evidence that the Hall Plaintiffs: (1) employed any device, scheme, or artifice to defraud; (2) made representations of any untrue statements, or knowingly or recklessly omitted from disclosure any material facts; or (3) engaged in any course of business which would serve to operate as a fraud or deceit. In addition, the Court finds that the Hall Plaintiffs did not know, and in the exercise of reasonable care, could not have known, of Mikulin's misrepresentation or omission.

■ Section 517.301(1)(b) prohibits the publication or circulation of any notice, circular, or communication which "describes such security for a consideration received or to be received directly or indirectly from an issuer, underwriter, or dealer, or an agent or employee" thereof, without disclosing past or prospective receipt of such consideration and the amount thereof.

The Court finds that considerations to be received from the issuer by the underwriter and broker/dealers were adequately disclosed in the Confidential Memorandum. (See Plaintiffs' Ex. 11, Cover Page at 2, Summary at 44–45).

Accordingly, Defendants' claim under § 517.301 is DISMISSED with prejudice.

#### (b) Failure to register [10]

■ Florida's Blue Sky laws require that "[n]o securities except of a class exempt ... or unless sold in any transaction exempt under any of the provisions of s. 517.061 shall be offered or sold within this state unless such securities have been registered...." *Fla.Stat.Ann.* § 517.07 (1987). It is undisputed that the Partnership's securities were not registered in Florida.

The Hall Plaintiffs rely for exemption upon *Fla.Stat.Ann.* § 517.061(11) and claim that theirs was an exempt transaction. That section exempts from registra-

---

**10.** With regard to the admissibility of Plaintiffs Halls' testimony regarding exemption from registration requirements under Florida law and the admissibility of Plaintiffs' related Exhibits 51, 52, 53 & 54, the Defendants' objections are *overruled.*

As Defendants Hardeman set forth in their Brief of 1/16/90, although "state law defines the nature of defenses, ... the Federal Rules of Civil Procedure provide the manner and time in which defenses are raised and when waiver occurs." *Morgan Guaranty Trust Co. v. Blum,* 649 F.2d 342, 345 (5th Cir.1981).

At issue here is the fact that the Plaintiffs' affirmative defense of exemption was not formally plead in the Plaintiffs' answer to the Defendants' counterclaim or in the parties' joint pretrial order. Notwithstanding the requirement that affirmative defenses are to be set forth when pleading to a prior pleading [Fed.R. Civ.P. 8(c) ], the Court is of the opinion that the Defendants had in fact been put on notice of Plaintiffs' affirmative defense of exemption during discovery, and so suffered no prejudice due

to the lack of the required formal pleading. (*See* Exhibits "B" and "C" to the Hall Parties' Supplemental Trial Brief filed 1/16/90). In addition, in the parties' Joint Pretrial Order, as well as in the Plaintiffs' Requested Findings of Fact, both of which were submitted to the Court or filed months before trial, the issue of the Plaintiffs' exemption was implicitly, if not explicitly, raised. (*See* Joint Pretrial Order, filed 9/5/89, Contested Issue of Fact No. 33 and Hall's Requested Findings of Fact No. 42, filed 3/27/89). "The pretrial order supercedes all prior pleadings, serving, in effect, as the operative answer and complaint in the case." *United States v. State of Texas,* 523 F.Supp. 703, 720 (E.D.Tex.1981). The pretrial order therefore becomes "the governing pattern of the lawsuit." *Morales v. Turman,* 535 F.2d 864, 867 n. 7 (5th Cir.1976), *rev'd on other grounds,* 430 U.S. 322, 97 S.Ct. 1189, 51 L.Ed.2d 368 (1977). After reviewing the parties' briefs and the factual circumstances surrounding this issue, the Court is of the opinion that the Defendants' objection should be overruled.

tion a transaction involving the sale by or on behalf of an issuer the issuer's own securities if *all* of the following conditions are met:

(1) there are no more than 35 purchasers in Florida;

(2) the securities were not sold through general solicitation or advertising;

(3) the purchasers were provided with, or given access to, full and fair disclosure prior to the sale;

(4) no "dealer" is paid a commission or compensation unless registered in Florida as a dealer; and

(5) when sales are made to 5 or more persons within Florida, any such sale is made voidable by the purchaser within 3 days after purchase or 3 days after that privilege is communicated to the purchaser, whichever occurs later.

The evidence introduced clearly demonstrated that there were only 32 unaccredited investors overall [11]; that full and fair disclosure was given and access was made available to same prior to the sale at issue; that only dealers registered in Florida were paid commissions; and that all Florida purchasers were informed of their right to void their purchase within 3 days of their tender of consideration. Thus, exemption requirements 1, 3, 4 and 5 above were all met.

The second requirement is set forth in § 517.061(11)(a)2 which states the following condition for exemption:

Neither the issuer nor any person acting on behalf of the issuer offers or sells securities pursuant to this subsection by means of any form of general solicitation or general advertising in this state.

As set forth *supra* at part I(B), Cox was a direct sales representative for HSC (Plaintiffs' Ex. 27). As a direct sales representative, Cox was paid commissions on a sliding scale, had the right of equity participation depending on the level of his sales, and was provided office space and other support services by HSC. (*Id.*).

In early September, 1985, Cox and Mikulin engaged in a door-to-door generalized sales effort in Miami, during which they called on and distributed information on the Partnership investment opportunity to various CPAs, attorneys, a broker/dealer, "various investment advisor type people and clients", as well as "some of the folks in the Hall Dadeland Towers" who officed there. (Cox Dep. at 51). It was during these calls that Cox and Mikulin met McHenry Hamilton and left with him "Hall summaries, background information on the Hall Real Estate Group, their track record and then memoranda and a summary on the Hall Dadeland Towers." (Mikulin Dep. at 38). The memorandum summarizing the financial attributes and expected performance of an investment in the Partnership, on Hall Securities Corporation letterhead, was admitted as Defendants' Ex. 24, and sets forth, *inter alia*, such details as cash flow, tax loss, the rate of annual appreciation required to return equity, cash flow guarantee, unit cost, and the discounted rate of return for a 50% bracket investor. The text of the letter reads as follows:

Dear _____:

The enclosed information about Dadeland Towers is an opportunity for your review and consideration that has many positive attributes. This offering has all of the important criteria for a successful economic investment:

. . . .

Please review the enclosed information and you will agree that this opportunity is truly outstanding. We will call you soon to answer any questions or to discuss any details that you may have regarding this investment.

Very truly yours,

William E. Cox   William H. Mikulin

Rule 3E–500.007, *Fla.Admin.Code* (1982) reads in pertinent part as follows:

(2) For purposes of Section 517.061(11)(a)2, Florida Statutes, general so-

---

**11.** Section 517.061(11)(b)(5) excludes accredited investors from the calculation of the number of investors in § 517.061(11)(a).

licitation or general advertising, shall be deemed to include, but not be limited to, the following:

(b) any ... letter, circular, notice or other written communication.

(3) Any ... letter, circular, notice or other written communication shall be deemed not to be in a form of general solicitation or general advertising when the issuer and any person acting on its behalf shall have reasonable grounds to believe after inquiry and shall believe that persons ... receiving such letter, circular, notice or other written communication:

(a) have. such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of the prospective investment; and

(b) are able to bear the economic risk to the prospective investment.

Pursuant to Rule 3E–500.007(2)(b), Cox and Mikulin's hand-delivery of the memorandum and brochures is *de facto* a general solicitation. With respect to whether the solicitation falls under the exception found in Rule 3E–500.007(3), there is no evidence that would indicate that Cox and Mikulin were acting with a reasonable belief after inquiry that Hamilton, "clients", and "the folks in the Hall Dadeland Towers who officed there" all had sufficient: (a) knowledge and experience in business matters; (b) capability to evaluate the merit and risk of the investment; and (c) the ability to bear the economic risk of the investment.[12] "[T]he burden of establishing the right to any exemption shall be upon the party claiming the benefit of such exemption." *Fla.Stat.Ann.* § 517.171 (1987); *Weinberg v. Pennington,* 462 So.2d 862 (Fla. 3d DCA 1985). Accordingly, the Court must find that this was a general solicitation not excepted by the provisions of Rule 3E–500.-007(3).

The central issue therefore is whether the general solicitations of underwriter HSC's direct sales representative, Cox, are to be construed as "acting on behalf of the issuer", the Hall Dadeland Partnership, within the meaning of § 517.061(11)(a)2.

HSC was a "best efforts" underwriter for the Partnership. (Plaintiffs' Ex. 11 at 44). "In a 'best efforts' underwriting, a person offers securities to third parties as agent for the issuer." *Securities Industry Association v. Board of Governors,* 627 F.Supp. 695, 707 (D.D.C.1986), citing 1 L. Loss, *Securities Regulation* 163–72 (2d ed. 1961). Thus, it is as if the Partnership itself entered into the direct sales representative contracts with Cox and Pilot Financial (Plaintiffs' Ex. 27, Defendants' Ex. 29). The representatives were to receive as consideration commissions based upon their level of sales; in turn, the Partnership, as principal, was to receive the representatives' services, *i.e.,* the solicitation of subscriptions. (Plaintiffs' Ex. 27 at ¶ 3). It would follow that Cox's actions in seeking to perform under that contract would be actions "on behalf of" the issuer.

In view of the above, and in view of positions taken by the SEC in circumstances analogous to this case [13], the Court is of

---

**12.** The SEC's predecessor to Regulation D, Rule 146, had a prohibition on general solicitation and exception thereto similar to Rule 3E–500.-007. The SEC opined that "[A] permitted communication must not only be directed to a qualified offeree but must also be directed to him in his capacity as offeree, rather than in his capacity as an intermediary who is asked to locate other qualified offerees." SEC No–Action Letter, Arthur M. Borden, Esq., available 9/15/77 [1977–78 Transfer Binder] *Fed.Sec.L.Rep.* (CCH) ¶ 81,597.

**13.** The parties apparently could find no Florida or federal case law dealing with this issue; nor could the Court. Because Florida's prohibition on general solicitation for unregistered securities and requirements for an exemption parallels that of the S.E.C.'s Regulation D, we turn to federal authority for guidance.

"Regulation D, Rules Governing the Limited Offer and Sale of Securities Without Registration Under the Securities Act of 1933", codified at 17 C.F.R. §§ 230.501–230.508, reads in pertinent part as follows:

§ 230.502 *General conditions to be met*

The following conditions shall be applicable to offers and sales made under Regulation D (§§ 230.501–230.508):

....

(c) [N]either the issuer nor any person acting on its behalf shall offer or sell the securities by any form of general solicitation or general advertising, including, but not limited to, the following:

the opinion that Cox's actions were "on behalf of" the issuer, Hall Dadeland Partnership, within the meaning of § 517.061(11)(a)2. Accordingly, the Hall Plaintiffs' affirmative defense of exemption to Florida's registration requirements must fail, and the issuer, the Hall Dadeland Partnership, is held in violation of *Fla.Stat. Ann.* § 517.07.

Pursuant to § 517.211(1), sales in violation of § 517.07 "may be rescinded at the election of the purchaser; and the person making the sale and every director, officer, partner or agent of or for the seller, if the director, officer, or agent has personally participated or aided in making the sale, is jointly and severally liable to the purchaser in an action for rescission." The Court finds that only the Hall Dadeland Partnership "personally participated" in the transaction at issue herein.

However, in *Rohdie v. Washington,* 641 S.W.2d 317, 320 (Tex.App.–El Paso 1982, reh'g denied), the court held that "[t]he Appellant as the general partner of the limited partnership is personally liable for the limited partnership's debts the same as a partner in a general partnership. Article 6132a, Section 10(a), Article 6132b, Section 15, Tex.Rev.Civ.Stat.Ann."

Article 6132a is the codification of the Texas Uniform Limited Partnership Act. Section 10(a) thereof provides that "[a] general partner shall have all the ... liabilities of a partner in a partnership without limited partners...."

Article 6132b is the codification of the Texas Uniform Partnership Act. Section 15 thereof provides that "[a]ll partners are jointly and severally liable for all debts and obligations of the partnership...."

It is thus quite obvious that, as a matter of law, Craig Hall and Hall 85 Associates will be jointly and severally liable for the debt resulting from the entry of judgment in this case, notwithstanding the fact that they did not "personally participate" as required by *Fla.Stat.Ann.* § 517.211(1). It does not seem to this Court to be in the interests of judicial economy to enter a judgment which renders only Hall Dadeland liable, knowing that other entities, by application of black-letter partnership law, will by operation of law immediately be jointly and severally liable upon entry of such a judgment. Thus, it is the Court's opinion that its equitable powers should be exercised so as to extend liability, jointly and severally, to Craig Hall and Hall 85 Associates.

(1) Any advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio; and

(2) Any seminar or meeting whose attendees have been invited by any general solicitation or general advertising.

Section 230.506, "Exemption for limited offers and sales without regard to dollar amount of offering", states that the conditions of § 230.502 must be met, and that the investors must all be accredited, "capable of evaluating the merits and risks of the prospective investment, or the issuer reasonably believes" that such purchasers come within this description, and that purchasers cannot exceed 35 in number.

In *J.D. Manning, Inc.,* SEC Interpretive Letter (issued 1/27/86), the inquiring company proposed to publish a regular newsletter that would list and describe companies in imminent need of private financing. Issuers would prepare and pay for material to be included. On these facts, the Staff determined that the publisher would be acting on behalf of the several issuers. *Accord, Texas Investor Newsletter,* SEC Interpretive Letter (issued 12/23/83) (where the principal for an issuer prepares material for publication in a newsletter and pays for its inclusion in the newsletter such activity would constitute general advertising on behalf of the issuer).

In *Alaska Co.,* SEC Interpretive Letter (issued 9/8/78), a Broadway producer proposed to pay an investment company to act as a "finder". The investment company would contact prospective investors, brief them on the offering, and refer them to the producer. The Staff opined that the finder would be acting "on behalf of" the issuer within the meaning of then-applicable Rule 146(c), 17 C.F.R. § 230.146(c) (rescinded 1982).

In the instant case, the Partnership was to receive 90% of the proceeds of any sale of a Partnership interest; HSC as underwriter was to receive 104, from which commissions to other broker/dealers engaged by HSC were to be paid. (Plaintiffs' Ex. 11, Cover Page at 2 and Summary at 45). In addition, the Partnership paid the costs and expenses related to the offering, such as the costs of brochures and the Confidential Memorandum to be distributed to potential investors. (*Id.*).

Section 517.211(6) provides that "the court shall award attorneys' fees to the prevailing party unless the court finds that the award of such fees would be unjust." Pursuant to the Hardemans' affidavit in support of attorneys' fees, the Court hereby awards attorneys fees to the Defendants in the amount of $51,918.50.

Section 517.211(3)(a) provides that the Hardemans may recover prejudgment interest at the legal rate on the consideration paid. Therefore, Defendants Hardeman shall file with this Court an affidavit setting forth the legal rate to which they are entitled, and shall include therein a calculation of the interest to which they are entitled bearing in mind that their payments were made in varying amounts and at varying times.

Judgment shall then be entered forthwith.

### (8) *Punitive damages*

The Court is of the opinion that punitive damages are not warranted under the circumstances. The Defendants' claim for same is DENIED.

### C. Plaintiff's Claim

Plaintiff seeks to recover on the unpaid balance of the Note executed in favor of the Partnership, together with accrued interest thereon and attorneys fees pursuant to terms of the Note. Because the Court has found that the underlying transaction was not exempted from registration requirements under Florida law, and because the transaction is rescinded, Plaintiff's claim is DISMISSED with prejudice.

SO ORDERED.